# Richmond

JOSEPH E. ELLIS, ET AL. v. COMMISSIONER OF THE DEPARTMENT OF MENTAL HYGIENE AND HOSPITALS, ET AL.

June 14, 1965.

Record No. 5961.

Present, All the Justices.

*Ralph R. Repass* and *Ralph L. Lincoln*, for the plaintiffs in error.

*G. R. C. Stuart* (*Penn, Stuart & Miller*, on brief), for the Commissioner of the Department of Mental Hygiene and Hospitals, et al.

SPRATLEY, J., delivered the opinion of the court.

On March 23, 1961, the State Highway Commissioner of Virginia instituted this eminent domain proceeding against Joseph E. Ellis, Margaret J. Ellis, his wife, L. Stuart Ellis and Frances G. Ellis, his wife, (defendants) for the acquisition of a portion of their property in connection with the construction of Interstate Route No. 81, near the Town of Marion, Smyth County, Virginia.

The Commissioner of the Department of Mental Hygiene and Hospitals, hereinafter referred to as Health Commissioner, filed a petition asking that he be made a party defendant to the proceeding. He alleged that a concrete block manufacturing plant, which the defendants claimed to own, as a part of their property being condemned, was, in fact, situated on land of the Southwestern State Hospital, a facility of the Department of Mental Hygiene and Hospitals, a State agency, and that any compensation for damages to the said plant should be awarded to his Department. The motion was denied. Thereafter, upon motion of the Highway Commissioner, and over the objection of defendants, the Health Commissioner was admitted as a necessary party.

In due course, the lower court appointed commissioners to ascertain what would be just damages for the land proposed to be taken by the proceeding and the damages, if any, resulting to the adjacent or the remaining property of the owner or owners by reason of the taking. Code, § 33-60.3, 1964 Cum. Supp. Overruling the objection of defendants, the court directed the commissioners to fix a gross amount for such damages, and also to ascertain separately any damage to the concrete block plant.

Pursuant to the directions, the commissioners awarded $101,650.00 for the land taken, and $117,400.00 for total gross damage to the residue of the property, including therein $35,300.00 damage to the concrete block plant. The Highway Commissioner paid the awards into court, and by order of the court the full amount thereof, less $35,300.00, was paid to the defendants. In view of the conflicting claims of the defendants and the Health Commissioner to the $35,300.00, that sum was withheld pending further order of the court.

The lower court next appointed a special commissioner, in accordance with § 33-67.2, 1964 Cum. Supp., to take evidence of the conflicting claims to the above $35,300.00 and report to the court.

The special commissioner reported that the erection of the concrete block plant by the defendants "on the Hospital property adjoining the quarry conforms with rights granted their predecessors in title," and "in harmony with" the reservations in a deed of J. D. Buchanan, dated November 30, 1927, to Southwestern State Hospital; that "the parties by their own actions since the erection of the cement block plant in 1951 have indicated the true construction of the instruments" involved; and, therefore, defendants were entitled to the $35,300.00.

The Health Commissioner excepted to the report and findings of the special commissioner on the ground that the commissioner erred in construing the instruments in question. The lower court sustained the exceptions; and on February 18, 1964, ordered that the $35,300.00, less certain costs and expenses, be paid to the Department of Mental Hygiene and Hospitals, as owner of the concrete block plant.

The defendants excepted, and were granted a writ of error. Subsequent to the granting of the writ, the State Highway Commissioner was, on December 1, 1964, dismissed as a party, it appearing that, after paying the award into court, he had no further interest in the matter. Only the disposition of the $35,300.00 is in dispute before us.

On appeal, the defendants contend that the lower court erred: (1) in permitting the Department of Mental Hygiene and Hospitals to be made a party defendant; (2) in directing the trial commissioners to find a separate amount as damages to the concrete block plant; and (3) in sustaining the exception of the Health Commissioner to the report of the special commissioner.

The facts may be summarized as follows:

For many years a stone quarry had been operated on the lands here involved near the Town of Marion, Virginia. The quarry consisted of the stone sources, a crushing building, scale house, truck storage, barns, sheds and other structures essential to stone quarrying.

In 1911, or thereabouts, J. D. Buchanan acquired a large tract of land upon a portion of which the above quarry was located. Subsequently, he and others, severally or jointly, operated the stone quarry until the date this proceeding was begun.

On November 30, 1927, J. D. Buchanan conveyed a part of the above tract, upon which the quarry was located, to Southwestern State Hospital. The deed, after describing generally the land conveyed as being that portion lying south of the Norfolk & Western Railway Company's right-of-way, near the middle fork of Holston River in Smyth County, Virginia, contains the following provisions with respect to rights reserved by the grantor:

"The party of the first part specifically exempts and reserves for himself and for the benefit of B. F. Buchanan, as his interest may now appear, all rights in and to the rock quarry now being operated on said property by Sprinkle & Ellis; and specifically reserves and exempts all rights and privileges conveyed by J. D. Buchanan and B. F. Buchanan or either of them to Sprinkle & Ellis, * * * in and to the rock quarry on the said property as set forth in a contract between J. D. Buchanan and O. C. Sprinkle and E. P. Ellis and Jas. Sparks, dated the 30th of November 1923 * * *.

"The party of the first part further reserves and excepts unto himself, his assigns, etc. for himself and for the benefit of B. F. Buchanan as his interest may appear, the right to quarry stone from the rock quarry on said property and ship and deliver the same, and for that purpose he reserves and excepts all necessary rights of ingress and egress to and from said property and all necessary rights of way to and from said property and also the right to the use of such surface of said land as may be necessary and convenient in and about the operation and maintenance of said rock quarry, including the right to erect buildings, crushers and other structures on property which may be convenient and useful and necessary for the proper operation thereof.

* * * * * * * *

"It is understood and agreed that the party of the second part shall

have the right to the use and occupancy of all of the surface of said land, except that portion which may be necessary and convenient for operating the quarry, and it is further understood and agreed that when the rock quarry shall have become totally exhausted that then all rights herein reserved on account of said quarry, shall cease, and shall be and become the property of the party of the second part.

"The land included within the quarry boundaries to be used and occupied for quarry operations as follows:" [A metes and bounds description is then given.]

The description is followed by this recital:

"But it is understood that the foregoing description does not include land which may be used for structures necessary to the operation of the plant, crusher buildings, crusher, etc. but the same may be placed at convenient points elsewhere on the property as may be necessary for the proper and convenient operation of the quarry. Together with a right of way over the property above specifically described to and from the point where said structures may be erected."

The instrument of November 30, 1923 referred to in the above deed, was a contract leasing the rock quarry here involved to O. C. Sprinkle, E. P. Ellis and James Sparks for a term of five years from its date, unless terminated as therein provided. The contract included the grant of an option to the parties of the second part to purchase the quarry at any time during the continuance of the lease. Nothing in the lease gave the grantees the right to build on any land except on the leased land, and any such building became the property of the lessor upon expiration of the lease. At any rate, so far as the record shows, the lease expired in five years; the option was not exercised; nor the land here involved subject to any lease when this proceeding was begun. It does appear, that the rock quarry was operated either by J. D. Buchanan, his heirs or lessees, or the defendants, before and subsequent to the deed made to Southwestern State Hospital.

On April 2, 1960, the Health Commissioner and the State Highway Department, both agencies of the Commonwealth of Virginia, entered into an agreement by virtue of § 2-4.1, Code 1950, as amended, whereby the former transferred the possession of approximately 86 acres of land, a portion of that which was theretofore conveyed by J. D. Buchanan to Southwestern State Hospital, for the purpose of constructing a portion of Interstate Route 81. The proposed new highway ran through lands of the Southwestern

State Hospital, and over a considerable portion of the land occupied by the quarry involved. In the agreement of April 2, 1960, no mention is made of the residue of the Hospital's land adjoining the proposed new highway, and there is nothing said about damages to the residue of the land belonging to the Hospital.

On September 28, 1960, David H. Buchanan and others, devisees, heirs and successors in title to J. D. Buchanan, conveyed to Joseph E. Ellis and L. Stuart Ellis, "all their rights, title and interest in and to that certain real estate, with all appurtenances thereunto belonging and subject to all easements thereto pertaining and described as follows: All rights now vested in the parties of the first part, in and to the rock quarry now being operated by Ellis Quarry, located * * *; the land included within the quarry boundaries to be used and occupied for quarry operations and more particularly described as follows:" (Here follows a description of the land by metes and bounds.)

The next paragraph recites that: "Further, the parties of the first part grant to the parties of the second part *all rights to quarry stone* from the rock quarry *on the aforesaid tract of land and to ship and deliver the same* and there is included all rights of ingress and egress to and from the property *and the use of the adjoining property and facilities as reserved and set out in the deed from J. D. Buchanan to Southwestern State Hospital, dated November 30, 1927 * * *.*" (Emphasis added.)

By this deed, the defendants acquired all of the rights reserved to J. D. Buchanan in the latter's 1927 deed to the Southwestern State Hospital, and thus occupied thereafter the same position as did J. D. Buchanan in his 1927 deed.

After the State abandoned the construction of macadam surfaced roads, the quarry had on hand large quantities of "fines," or small stones for which there was no market. In 1951, the defendants, then operating the quarry, decided to utilize the small stones by manufacturing concrete blocks for building purposes. The process consisted of mixing cement with water and small stones. Accordingly, the defendants constructed a concrete block manufacturing plant on the land of Southwestern State Hospital, outside the area occupied by the quarry, and operated that plant continuously thereafter.

L. Stuart Ellis said that he had showed a Mr. Hubble, who was at the time of the construction of the plant, the steward or farm manager of Southwestern State Hospital, where the plant would

be located, and that Hubble made no objection. Hubble died before this proceeding was begun.

Dr. Joseph R. Blalock, Superintendent of the Southwestern State Hospital since 1938, testified that he knew nothing of the concrete plant, nor did anyone in authority with the Department of Mental Hygiene and Hospitals, or the State Hospital Board, discover its presence until after this proceeding was initiated.

It is further in evidence that there were no concrete block plants in the southwestern portion of Virginia, where Smyth County is located, until about 1935, eight years after the execution of the deed of November 30, 1927, or that such a plant was within the contemplation of the parties to that deed when it was executed and delivered.

The assignments of error will be considered in the order stated hereinabove:

## I

Did the lower court err in permitting the Health Commissioner to be made a party defendant? We think not.

Code, § 33-60.1, 1964 Cum. Supp., provides, in part, that: "The petition [in eminent domain proceedings] shall set forth * * * the name or names of the owners whose property is to be taken, or affected, and such other facts, if any, as may be deemed necessary by the Commissioner to give full information to the court and all persons in interest. * * *" Since Southwestern State Hospital, a facility of the Department of Mental Hygiene and Hospitals, had title to the land outside the quarry reservation, whereon the concrete block plant was located, and was asserting ownership of the block plant, the Highway Commissioner was required by the statute to make the Health Commissioner a party to the proceeding.

## II

Nor do we think the lower court erred in directing the trial commissioners to separately specify the amount to be awarded for damage to the concrete block plant. The court carefully told the commissioners that such separate listing was not to influence the total amount of their award, and there is no evidence it did. Several witnesses testified as to the value of the concrete block plant and the damage thereto.

No written exception by the defendants was filed in the lower

court to any part of the report of the trial commissioners within ten days after the rendering of their report, or thereafter. Code, § 33-64, 1964 Cum. Supp. Defendants, therefore, waived any claim of error in such report, and cannot, for the first time, raise an exception in this Court. In appointing the special commissioner to take evidence of the conflicting claims, the lower court followed the procedure prescribed by Code, § 33-67.2, 1964 Cum. Supp.

### III

The contention that the lower court erred in sustaining the exception of the Health Commissioner to the report of the special commissioner finds its basis in the claim of defendants that the court failed to correctly "construe the deed of J. D. Buchanan to South-western State Hospital, and other constructions in connection there-with."

Defendants argue that the provisions of the above deed read in connection with the lease-purchase contract of November 30, 1923, gave them the right to construct and operate structures on such land outside of the quarry area, as might be "convenient, useful and necessary for the proper operation of" the quarry.

They further argue that the failure of the steward of the Hospital and Dr. Blalock to object to the construction of the block plant is "significant in the construction of the instruments involved." In addition, they claim that the owners of the quarry had a right to enlarge and extend the quarry operations on adjacent land in order to keep pace with modern quarry operations.

The lease-purchase contract of November 30, 1923, sheds no light on the construction of the deed of 1927. Reference to the contract in that deed was due to the fact that the land conveyed was in 1927 subject to the provisions of the contract. The contract serves only to describe the land occupied by the quarry, and to show the agreement between the particular parties thereto. The contract expired more than twenty years before the defendants acquired rights to the quarry.

It was not shown that the Southwestern State Hospital or the State gave consent to the establishment of the concrete block plant on the land of the Hospital. A State acting in its sovereign or governmental capacity cannot be bound by the unauthorized acts or representations of its employees and agents. *Robert T. Main, Jr.* v. *Department of Highways*, 206 Va. 143, 142 S. E. 2d 524, this day decided; 19 Am. Jur., Estoppel, § 166, page 818.

This brings us to a consideration of the language and provisions in the November 30, 1927 deed of J. D. Buchanan to the Hospital, the principal issue in the case.

It is well settled that, in construing the language of a deed, the chief object is to ascertain the grantor's *intent. Fitzgerald* v. *Fitzgerald,* 194 Va. 925, 929, 76 S. E. 2d 204; *Yukon Pocahontas Coal Co.* v. *Ratliff,* 181 Va. 195, 202, 24 S. E. 2d 559. Should there exist any doubt or ambiguity as to the meaning, the deed must be construed against the grantor. 5 Mich. Jur., Deeds, § 58, page 732. A deed must be construed as of the date and under the circumstances of its execution. *Rhoton* v. *Rollins,* 186 Va. 352, 360, 42 S. E. 2d 323; *Schwarzschild* v. *Welborne,* 186 Va. 1052, 1058, 45 S. E. 2d 152, 155.

In *Jernigan* v. *Capps,* 187 Va. 73, 79, 45 S. E. 2d 886, 889, we said:

"It is an elementary rule of construction that the purpose or intent of a written instrument must be determined from language used in the light of the circumstances under which it was written. * * *" 187 Va., *supra,* page 79. *Traylor* v. *Holloway,* 206 Va. 257, 142 S. E. 2d 521, this day decided.

Applying the above rules in the construction of the 1927 deed, we find that the grantees therein, defendants here, had the right *"to quarry stone from the rock quarry on said property* (the quarry property) *and ship and deliver the same* (stone) and for that purpose * * *," and the right of ingress and egress to the property, and "also the *right* to the use of such surface of said land as may be necessary and convenient in and about the operation and maintenance of said rock quarry, including the right to erect buildings, crushers, and other structures on property which may be convenient and useful and necessary for the proper operation thereof." (Emphasis added.)

Thus, the owners of the reservation had broad quarry rights within the specified quarry area. Outside that area their rights were limited by the following language:

"(T)he party of the second part (the Hospital) shall have the right to the use and occupancy of all the surface of said land, except that portion which may be necessary and convenient for operating the quarry," and when the rock quarry shall have been exhausted, all rights reserved on account of the quarry shall become the property of the Southwestern State Hospital.

Further, the deed contains the following language:

"But it is understood that the foregoing description (of the quarry land) does not include land which may be used for *structures neces-*

*sary to the operation of the plant, crusher buildings, crusher,* etc., but the same may be placed at convenient points elsewhere on the property as may be necessary for the proper and convenient operation of the quarry." (Emphasis added.)

It is manifest that all of the rights reserved with respect to the use of land outside the quarry area clearly relate to the specific right "to quarry, (that is, to dig or take) stone from the rock quarry on said property and ship and deliver the same."

The reservation of *that specific right* is the primary purpose of the deed. No right is reserved to build structures outside of the quarry area, or to use such property, except when it is "convenient and useful and necessary" for the proper operation of the quarry. The manufacture of concrete blocks is not a quarry operation. It is a manufacturing process, and the fact that a by-product of the quarry, small stones, is used as an ingredient in the process does not qualify the manufacture of artificial stone as a quarry operation. If otherwise considering the wide use of natural stone, one could well wonder where quarry operations cease. Moreover, there is no showing that the establishment and operation of a concrete block plant is "necessary" or essential to the proper operation of a quarry.

*Yukon Pocahontas Coal Co.* v. *Ratliff,* 181 Va., *supra,* dealt with mineral and mining rights in a tract of land conveyed, together with "sufficient surface for making drift mouths, air-shafts, wells and sufficient land on which to erect tipples, tanks, pipe lines * * * and other devices necessary for the successful mining and manufacturing and removing" coal on or underlying the tract of land. The owner of the minerals contended that he had acquired the right to construct stores, warehouses, supply houses, miners' homes, and other structures. We held that such structures were not within the contemplation of the parties who made the deed, applied the rule *expressio unius est exclusio alterius,* and rejected an economic necessity argument akin to that of the defendants in the present case.

In *General Refractories Co.* v. *James,* 222 Ky. 652, 1 S. W. 2d 1059, the Company acquired by deed mineral rights in a certain tract of land along with, *inter alia,* the "right to take said mineral from said land in whatever manner it may decide is most economical or convenient * * *." Thereafter, it erected on the surface of the said land a residence for the night watchman for its mines, and a barn for mules used in the mines. The surface owner brought suit, the question being whether the above quoted clause of the deed to

the Company was broad enough to support the contested use of the surface. The court held it was not, saying:

"We are of the opinion that this provision of the deed relates only to the method of mining and has nothing to do with any economical or convenient way for appellant to conduct its business aside from such method of mining * * *. The provisions taken together relate solely to the mining and removal of the clay. That portion of them relied upon by appellant is found in the midst of other clauses dealing only with the methods of mining and removal of the clay. It is clear that the parties did not intend by the italicized clause to enlarge on the purpose of the other clauses, but only to give the appellant a freer hand in carrying out such purposes. The buildings which were erected were built in order that appellant could conveniently conduct its business, but such buildings had no relation to any method of mining or removing the clay underlying this property."

Defendants cite and rely upon the following three cases. Each may be distinguished on the facts from those present in the case under review.

In *Stonegap Colliery Co.* v. *Kelly and Vicars*, 115 Va. 390, 79 S. E. 341, 48 L. R. A. (N. S.) 883, the question involved was whether the lessee of coal lands was entitled to use the surface of the land for its operations, including the building of houses upon the land for employees of the lessee. We held, based upon evidence of the custom in the coal industry at the time, the lessee had such right. There we said:

"Those things which are appurtenant to a mine will pass under a lease of the mine as a necessary part thereof, although not mentioned in the lease." (115 Va., at page 392).

In *Hagan Co.* v. *Norton Coal Co.*, 137 Va. 140, 119 S. E. 153, we considered the meaning of the words "necessary *or* convenient." (Emphasis added.)

Here, in the Buchanan deed of 1927, the words used were "convenient, useful *and* necessary," in the conjunctive rather than in the disjunctive. (Emphasis added.) There has been no showing in the present case that a concrete block manufacturing plant is convenient and necessary to the operation of a rock quarry, or that such a plant was within the contemplation of the parties in the 1927 deed.

In *Young and Sons* v. *Kirk*, 202 Va. 176, 116 S. E. 2d 38, the landowner, for a consideration, conveyed certain land to the State for highway construction, and in the conveyance expressly released

the State from all claims for damages, except those caused by negligence. Here, the agreement transferring the property from Southwestern State Hospital to the State Highway Commissioner dealt only with the possession of land acquired for the specified project.

Here, since the Department of Mental Hygiene and Hospitals is the owner of the land on which the concrete block plant was constructed without authority and without the consent of the landowner, and the plant consists of a structure affixed to the freehold, we conclude that the owner of the freehold, the Department of Mental Hygiene and Hospitals, is entitled to the $35,300.00 awarded as damages to the plant.

For the foregoing reasons, the judgment of the trial court is affirmed.

*Affirmed.*